2025 IL App (1st) 231345-U

FIRST DISTRICT,
SIXTH DIVISION
May 30, 2025

No. 1-23-1345

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 16 CR 18759 |
| | ) | |
| ROBERT WALTERS, | ) | Honorable |
| | ) | Carol M. Howard, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE GAMRATH delivered the judgment of the court.
Justices Hyman and C.A. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The evidence at trial was sufficient to support defendant's convictions for criminal sexual assault and there was no violation of defendant's rights under the double jeopardy clause.

¶ 2    Following a bench trial on May 11, 2022, the circuit court found defendant Robert Walters guilty of two counts of the aggravated criminal sexual assault of L.R. (720 ILCS 5/11-1.30(a)(4) (West 2014)) stemming from an incident the night of December 23, 2014. On April 20, 2023, the circuit court reduced Walters's convictions to the lesser-included offense of criminal sexual assault

(720 ILCS 5/11-1.20(a)(1) (West 2014)) and sentenced him to serve consecutive five-year terms of imprisonment for each count.

On appeal, Walters contends (1) he was not proven guilty of criminal sexual assault and (2) the circuit court's reduction of his convictions from aggravated criminal sexual assault to criminal sexual assault violated double jeopardy principles. We affirm.

¶ 3                                I. BACKGROUND

¶ 4        On December 22, 2016, the State charged Walters with 27 total counts of aggravated kidnapping, aggravated criminal sexual assault, criminal sexual assault, aggravated criminal sexual abuse, and criminal sexual abuse. Immediately before trial began on May 9, 2022, the trial court admonished Walters of his right to a jury trial and potential sentences if found guilty. Walters waived his right to a jury and proceeded to bench trial. The State elected to proceed to trial on two counts of aggravated kidnapping and eight counts of aggravated criminal sexual assault. The State voluntarily dismissed the remaining charges by means of *nolle prosequi*.

¶ 5        At trial L.R. testified that in December 2014, she was 24 years old and studying for her master's degree. On December 21, 2014, she met Walters on a dating app, OkCupid. They began exchanging messages and planned to meet on December 23, 2014. Around 9:00 p.m. that night, L.R. arrived at The Sports Corner bar in Wrigleyville. Walters parked his car and arrived shortly thereafter. L.R. first noticed Walters looked "much older" than 32 years old as he presented himself to be on the dating app.

¶ 6        Walters began talking "rapidly and erratically," "made comments about [her] body," and asked "invasive questions" that made L.R. feel "uncomfortable." When Walters tried to order shots, L.R. initially refused and ordered a beer instead. She later acquiesced in response to Walters's "extreme pressure."

¶ 7        At one point, Walters stood up to go to the bathroom and "insisted" L.R. kiss him. L.R.

declined because she had just met him but Walters "kept getting closer" and remained "very insistent" so she gave him a "peck on the cheek." Apparently dissatisfied, Walters said "that was not good enough" and "aggressively kissed" her and pinched her on the side and hip. L.R. felt "very uncomfortable" but did not leave the bar because she thought Walters was "very unstable" and she did not want to "escalate the situation" or be followed home. L.R. acknowledged she did not alert a waitress or anyone else at the bar when Walters was in the bathroom because she did not feel like she had an "adequate opportunity" to do so. L.R. texted two friends during the date but did not ask them to get her a ride.

¶ 8        Around 10:00 p.m., L.R. told Walters she wanted to go home but he "insisted" on taking her, so she agreed to go to another bar instead. L.R. thought they would be taking a cab to get to the bar, but Walters walked them to his car. L.R. "did not want to get in the car" but did so after Walters was "very insistent." Before they got in the car, Walters grabbed her vaginal area over her leggings. Inside the car, Walters grabbed L.R.'s butt and she asked him to stop several times before he did.

¶ 9        While driving, Walters tried to kiss L.R. "several times." Walters said he needed to get cash at home and drove to an apartment building. L.R. intended to stay in the car while Walters went up to his apartment and leave when he was gone. Walters insisted she not wait in his car by herself. Because L.R. did not see anybody around to help her, she got out of Walters's car to wait in the lobby while he went up to his apartment. When they reached the lobby, Walters insisted she not wait alone in the lobby. L.R. agreed to accompany him upstairs. As L.R. stood in the doorway Walters "grabbed [her] wrist and pulled [her] in."

¶ 10        In the apartment, Walters "tried to pressure" L.R. into taking more shots. L.R. agreed to drink a vodka and Red Bull instead. When L.R. walked towards the living room Walters grabbed her arm and pulled the sleeve of her sweater until he was able to remove it. Walters pulled L.R.

onto the couch and tried to take off her scarf and tank top. L.R. told him "no" and "stop," but he continued to take off her scarf and tank top. When Walters tried to take off her bra, L.R. resisted. She finally took it off herself because she was concerned he would tear it. Walters then began kissing and squeezing her breasts "really hard," hurting her.

¶ 11 Walters again grabbed L.R. by the wrists and pulled her into his bedroom. L.R. tried to dig her heels in but was "overpowered." Walters pushed her onto the bed and started to remove her boots and leggings. L.R. tried to keep her legs closed but Walters forced her legs open and took off her leggings and underwear. L.R. told him she was "on [her] period" and had a tampon in. Walters laughed, "made" her take out the tampon, and threw it on the floor.

¶ 12 Walters removed his own clothing and "gestured to present his erection" to L.R. He "looked down at it," then looked and L.R. and "raised his eyebrows." Walters then put his penis inside L.R.'s vagina. L.R. said "no" and "stop" but Walters told her "this is what [she] wanted." L.R. was scared and felt like she was in danger. She hit Walters and tried to push him off of her but was unsuccessful. Eventually, L.R. hit Walters in the throat with the bridge of her palm. He said he was "okay" and stopped temporarily.

¶ 13 Walters then "repositioned" L.R. on the bed and began performing oral sex on her by using his tongue to make contact with her labia and vulva. He told her how "good" she tasted and began to pass his tongue over her anus. L.R. tried to get up but Walters pushed her down and inserted his penis into L.R.'s vagina again. At some point, L.R. stopped struggling against Walters because he seemed to be "enjoying" the struggle. L.R. acknowledged Walters never threatened her and she never attempted to alert his neighbors during the assault. Eventually, Walters stopped but L.R. did not know if he had ejaculated.

¶ 14 L.R. got off the bed and looked for her clothes. Walters threw them across the room and told her she was "his lady" and he would buy her flowers because they "were something." L.R.,

however, made it "clear that [she] didn't want that." L.R. was ultimately able to find most of her clothing except for her underwear. Walters insisted on driving her home but L.R. declined because she did not want him to know where she lived. Instead, she agreed he could accompany her downstairs so she could hail a cab. When they got to the elevator, Walters went back to his apartment to retrieve his phone and L.R. left without waiting for him.

¶ 15        L.R. ran to a nearby intersection and hailed a cab. After contacting her friend and sister, L.R. contacted emergency services and was brought by ambulance to the hospital. L.R. submitted to a rape kit and spoke to several law enforcement officers. L.R. testified her vagina was "very sore" and her muscles felt "tender" after the encounter with Walters.

¶ 16        L.R. met with Chicago Police Detective Ronald Schmuck on January 18, 2015. She identified Walters in a photo array and provided Schmuck with Walters's phone number, screenshots of his OkCupid profile, and a series of text messages that he sent her after the incident.

¶ 17        Schmuck called Walters and they met on February 24, 2015. Walters was taken into custody, and a DNA sample was taken. Schmuck submitted the sample for analysis and Walters was released from custody. On May 12, 2016, Schmuck was notified that Walters's DNA matched samples collected from L.R. He also learned that Walters's DNA was associated with another sexual assault case involving a woman named M.D.[1] Schmuck met with M.D. on August 7, 2016, and L.R. on November 15, 2016. Walters was arrested again on November 16, 2016, and subsequently charged with 27 total counts of aggravated kidnapping, aggravated criminal sexual assault, criminal sexual assault, aggravated criminal sexual abuse, and criminal sexual abuse.

¶ 18        M.D. testified she did not know L.R. but had a previous interaction with Walters. The night of April 13, 2013, M.D. was at a club with friends when she stepped outside because she was

---

[1] Prior to trial, the State filed a motion to admit proof of other crimes specifying two other cases in which Walters was charged with sexual offenses. The court granted the State's motion in regard to M.D. only.

feeling sick and dizzy. While she was sitting on the curb, Walters pulled up in a black car and insisted on taking her home. M.D. had never met Walters before, but she did not scream for help when he picked her up and put her in the car. Walters drove to a building and "kind of *** dragged" M.D. up to a second-floor apartment. In the apartment, M.D. faded in and out of consciousness. When she awoke, she was naked in bed. Walters was on top of her with his penis in her vagina. M.D. fell out of consciousness again and when she woke up, Walters's penis was in her anus. M.D. testified she did not consent to having sex with Walters but acknowledged when she spoke to police detectives on April 17, 2013, she told them she did not remember saying "no." The parties stipulated that M.D. was treated for sexual assault and alcohol intoxication after the incident.

¶ 19        After a "short recess" following the conclusion of evidence and closing arguments, the circuit court found Walters not guilty of the aggravated kidnapping charges and guilty of two counts of aggravated criminal sexual assault. The two counts of aggravated criminal sexual assault, counts 13 and 14, were predicated on contact between Walters's penis and L.R's vagina and Walters's mouth and L.R.'s vagina, respectively.

¶ 20        The court noted the offenses occurred "after [L.R] hit [Walters] in the neck with the ridge of her palm." The circuit court found: "Even if there was confusion beforehand about her consent[,] once she hit him in the neck with her palm – with the ridge of her palm there should not have been any confusion on his part whatsoever."

¶ 21        On November 21, 2022, Walters filed a posttrial motion through new defense counsel. His amended motion, filed on March 3, 2023, argues the State failed to prove him guilty beyond a reasonable doubt and raises various evidentiary issues. Specifically, it contends the evidence presented at trial "demonstrates a lack of force and every indicium of consent." The circuit court rejected Walters's challenge to the sufficiency of the evidence, finding the evidence showed "he continued to pursue sex after [L.R.] clearly indicated that she did not want sex." The court

continued: "She hit him in the throat with the palm of her hand, indicating that she wanted to stop; she did not want to go any further. And so to the extent that he continued on after she made it unequivocally clear that she did not want to have any sex, that's why he was found guilty of those two main counts *** Any reasonable person should have known that she had withdrawn her consent at that point, and that's why he was found guilty of those two counts."

¶ 22    Walters's counsel filed a second posttrial motion on April 17, 2023, again arguing the State failed to prove force or the threat of force during the assault. Additionally, he argued the circuit court had acquitted him of "each of the 'other felonies' charged." Accordingly, the State failed to prove that he committed the sexual assault during the course of another felony to sustain his convictions for aggravated criminal sexual assault.

¶ 23    At the hearing on Walters's second motion, the parties agreed that because Walters was not convicted of the underlying felonies of criminal sexual abuse as charged, the court could not have found him guilty of aggravated criminal sexual assault as charged in Counts 13 and 14. Walters argued the circuit court should dismiss his convictions outright while the State argued the court should reduce each conviction to the lesser-included offense of criminal sexual assault.

¶ 24    The court again rejected Walters's sufficiency of the evidence argument, reiterating: "[S]he wanted to stop and he would not stop. He would not allow the interaction to end. His persistence in the sexual act when she clearly indicated that she didn't want to do it I think is sufficient." The court ultimately "reduce[d]" Walters's aggravated criminal sexual assault convictions to criminal sexual assault convictions. The court sentenced Walters to consecutive terms of five years' imprisonment on each count, for a total sentence of ten years. Walters appeals.

¶ 25                                II. ANALYSIS

¶ 26    On appeal, Walters argues (1) the evidence was insufficient to prove him guilty beyond a reasonable doubt where the evidence did not show that the sexual acts were accomplished by force

or the threat of force and (2) the circuit court's reduction of his convictions from aggravated criminal sexual assault to criminal sexual assault violated double jeopardy principles.

¶ 27                                    A. Sufficiency of the Evidence

¶ 28        Walters first argues the State did not prove him guilty of criminal sexual assault because it did not prove the sexual acts were accomplished by force or the threat of force. In reviewing the sufficiency of the evidence, "the question is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). It is not our function to retry Walters or substitute our judgment for that of the trier of fact on the weight given to the evidence or credibility of witnesses. *People v. Brown*, 2013 IL 114196, ¶ 48. Further, we need not "search out all possible explanations consistent with innocence." *People v. Wheeler*, 226 Ill. 2d 92, 117 (2007). Nor must each piece of evidence be satisfied beyond a reasonable doubt. *Jackson*, 232 Ill. 2d at 281. Instead, we consider all the evidence taken together. *Id.* "We will not reverse a conviction unless the evidence is so improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of defendant's guilt." *People v. Collins*, 214 Ill. 2d 206, 217 (2005).

¶ 29        Walters urges us to refrain from considering "facts the lower court disregarded and did not consider in its finding." This is nonsensical. We are not mind readers and do not know what the circuit court did or did not consider in making its oral findings. Moreover, we are not bound to make our decision based only on the evidence the circuit court announced in its finding of guilt but must consider all the evidence in the light most favorable to the prosecution. *Jackson*, 232 Ill. 2d at 281; *McLaurin*, 2020 IL 124563, ¶ 22.

¶ 30        To prove Walters guilty of criminal sexual assault, the State was required to prove he committed "an act of sexual penetration and *** use[d] force or threat of force." 720 ILCS 5/11-

1.20(a)(1) (West 2014). Walters does not dispute he committed the acts of sexual penetration alleged in this case. Instead, he argues the State failed to prove that he committed the acts of penetration while employing force or threat of force.

¶ 31        "Force or threat of force" is defined as:

"[T]he use of force or violence or the threat of force or violence, including, but not limited to, the following situations:

(1) when the accused threatens to use force or violence on the victim or any other person, and the victim under the circumstances reasonably believes that the accused has the ability to execute that threat; or

(2) when the accused overcomes the victim by use of superior size, physical restraint, or physical confinement." 720 ILC 5/11-0.1 (West 2014).

¶ 32        There is "no definite standard establishing the amount of force which the State is required to prove in order to prove criminal sexual assault, and each case must be considered on its own facts." *People v. Alexander*, 2014 IL App (1st) 112207, ¶¶ 52, 54. Force "does not include the force inherent to the act of physical penetration; instead, there must be some kind of physical compulsion, or threat thereof, that causes the victim to submit to the penetration against their will." *People v. Lamonica*, 2021 IL App (2d) 200136, ¶ 42. Although the act of sexual penetration occurs at a fixed point in time, the use or threat of force "does not occur solely at the precise time of sexual penetration." *People v. Smith*, 2019 IL App (1st) 161246, ¶¶ 28-29. The use of force precedes the act of sexual penetration by "whatever amount of time it takes to 'overcome' the victim." *Id.* ¶ 30. "If circumstances show resistance to be futile or life endangering or if the victim is overcome by superior strength or fear, useless or foolhardy acts of resistance are not required." *People v. Bolton*, 207 Ill. App. 3d 681, 686 (1990). "The question of whether force or threat of force was used is best left to the trier of fact who heard the evidence and observed the demeanor

of the witnesses." *People v. Gonzalez*, 2019 IL App (1st) 152760, ¶ 38.

¶ 33 The evidence shows that after a fraught series of events the night of December 23, 2014, Walters and L.R. engaged in sexual intercourse when he put his penis inside L.R.'s vagina. At some point during the intercourse, L.R. felt scared and told Walters "no" and "stop." When Walters continued, she hit him in the throat with her hand to get him to stop. He stopped temporarily, only to physically "reposition[]" L.R. on the bed, and began performing oral sex on her. She tried to get up, but Walters pushed her down and inserted his penis in her vagina again. L.R. stopped struggling against Walters because he seemed to be "enjoying" the struggle. Accordingly, the force came after L.R. made her desire to stop abundantly clear to Walters through words and physical actions. As the trial court aptly found: "[E]ven if there was confusion beforehand about her consent once she hit him in the neck *** with the ridge of her palm there should not have been any confusion on his part whatsoever." Nonetheless, Walters continued and physically moved L.R. into a different position to lick her vagina and anus. When she tried to get up and end the encounter, he pushed her down and again put his penis into her vagina. Walters' "persistence" coupled with these physical acts constitutes the requisite force or threat of force to sustain his convictions.

¶ 34 *People v. Denbo*, 372 Ill. App. 3d 994 (2007) is distinguishable. In *Denbo*, we reversed the defendant's aggravated criminal sexual assault conviction because the victim, R.H., initially provided implicit consent to a sexual encounter "by allowing defendant to undress her, to spread her legs apart, and to position herself between [R.H.'s] legs." *Id.* at 1006. As the encounter progressed, R.H. withdrew her consent by pushing the defendant. *Id.* at 996-97. The defendant stopped after R.H. pushed her a second time. *Id.* at 997. We concluded "no rational trier of fact could find, beyond a reasonable doubt, that a reasonable person, in defendant's circumstances, would have understood that initial push as a withdrawal of consent." *Id.* at 1008. Conversely, Walters refused to stop after L.R. struck him in the neck. He doubled down by moving L.R. into a

new position and pushed her down when she tried to leave. This is sufficient to find force beyond a reasonable doubt.

¶ 35      Citing *People v. Novak*, 163 Ill. 2d 93 (1994), a jury-trial case, Walters argues that because force was a disputed factual element, the court erred in considering a lesser-included offence containing the same element of force. We disagree. Contrary to Walters' claim, there is a valid distinction between jury trials and bench trials. Because Walters took a bench trial, *Novak* is inapplicable.

¶ 36      It is well established that "a judge presiding over a bench trial may convict a criminal defendant of an uncharged lesser-included offense *sua sponte.*" *People v. Walton*, 378 Ill. App. 3d 580, 588 (2007). In contrast, in a jury trial, unless a lesser-included offense instruction is tendered, the jury "does not have the option to convict the defendant of an uncharged lesser-included offense." *Id.* Instead, the jury will be forced to decide either to convict or acquit him. This avoids the possibility of a compromise verdict where the "jury may be induced to find defendant guilty of the lesser offense rather than to continue the debate as to his innocence." *People v. Benford,* 349 Ill. App. 3d 721, 728 (2004).

¶ 37      A lesser-included offense is one that "[i]s established by proof of the same or less than all of the facts or a less culpable mental state (or both), than that which is required to establish the commission of" another offense. 720 ILCS 5/2-9 (West 2014). Criminal sexual assault is a lesser-included offense of aggravated criminal sexual assault. See 720 ILCS 5/11-1.30 (West 2014); *People v. Giraud*, 2011 IL App (1st) 091261, ¶ 35 (reducing defendant's aggravated criminal sexual assault conviction to the lesser included offense of criminal sexual assault where no aggravating factor was proved). Because Walters was convicted after a bench trial, his attempt to equate this case with the jury trial in *Novak* is unconvincing.

¶ 38                                                B. Double Jeopardy

¶ 39       Walters's next argument pertaining to double jeopardy is equally unavailing and contrary to legions of federal and state case law. In arguing the court violated his "Fifth and Fourteenth Amendment rights against double jeopardy" by vacating his convictions for aggravated criminal sexual assault and imposing judgment on the lesser-included offense of criminal sexual assault, Walters takes a novel approach. He asks us to hold jeopardy should have attached before the State dismissed numerous counts against him prior to trial, not when the first witness was sworn in his bench trial. We decline.

¶ 40       "The double jeopardy clause of the fifth amendment to the United States Constitution, made applicable to the states through the fourteenth amendment, provides that no person shall 'be subject for the same offence to be twice put in jeopardy of life or limb.' " *People v. Bellmyer*, 199 Ill. 2d 529, 536-37 (2002) (quoting U.S. Const., amend. V). "The double jeopardy clause protects against three distinct abuses: (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense." *People v. Placek*, 184 Ill. 2d 370, 376-77 (1998). "The Fifth Amendment's prohibition against placing a defendant 'twice in jeopardy' represents a constitutional policy of finality for the defendant's benefit." *United States v. Jorn*, 400 U.S. 470, 479 (1971). The underlying idea behind the prohibition against double jeopardy "is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty." *Green v. United States*, 355 U.S. 184, 187-88 (1957). Both the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, § 10) and section 3-4(a) of the Code (720 ILCS 5/3-4(a) (West 2014)) ensure this same protection. *People v. Gaines*, 2020 IL 125165, ¶ 23.

¶ 41    "The starting point in any double jeopardy analysis, of course, is determining whether or not jeopardy had attached." *People ex rel. Mosley v. Carey*, 74 Ill. 2d 527, 534 (1979). It is well settled that in a bench trial, jeopardy attaches "when the first witness is sworn and the court begins to hear evidence." *Bellmyer*, 199 Ill. 2d at 538. See also *U.S. v. Martin Linen Supply Co.*, 430 U.S. 564, 569 (1977) ("This state of jeopardy attaches *** in a bench trial[] when the judge begins to receive evidence."). Whether Walters was "twice placed in jeopardy for the same offense presents a question of law subject to *de novo* review." *Gaines*, 2020 IL 125165, ¶ 24.

¶ 42    Walters acknowledges "jeopardy commonly attaches in a bench trial when the first witness is sworn," but argues that the "arbitrariness of rigid attachment of double [*sic*] jeopardy" fails to "safeguard due process and double jeopardy rights." Decades of established case law precedent says otherwise, and we find no reason to alter the long-established point of jeopardy attachment. See *Bellmyer*, 199 Ill. 2d at 538; *Martin Linen Supply Co.*, 430 U.S. at 569. Rather, we find jeopardy attached when L.R. was sworn in as the first witness in Walters's bench trial.

¶ 43    Prior to trial commencing, the State elected to proceed on ten counts, including aggravated criminal sexual assault, and voluntarily dismissed the remaining charges, including criminal sexual assault, by *nolle prosequi*. Under well-established Illinois law: " 'A *nolle prosequi* is not a final disposition of the case, and will not bar another prosecution for the same offense.' " *People v. Daniels,* 187 Ill. 2d 301, 312 (1999) (quoting *People v. Watson*, 394 Ill. 177, 179 (1946)). Rather, a *nolle prosequi* " 'leaves the matter in the same condition in which it was before the commencement of the prosecution.' " *Id.* Accordingly, the State's *nolle prosequi* of the original criminal sexual assault counts did not bar the court from imposing judgment on criminal sexual assault as a lesser-included offense. See *People v. Knaff*, 196 Ill. 2d 460, 473 (2001) ("The State's request to dismiss the lesser charges prior to jeopardy attaching in this case was of no import, as the defendant did not actually need to be charged with the lesser offense in order to be convicted

of it").

¶ 44     Nonetheless, Walters argues that by dismissing the charges of criminal sexual assault before trial and proceeding only on counts of aggravated criminal sexual assault, he was "deprived of notice" of the charges he faced at trial. However, as previously noted, criminal sexual assault is a lesser-included offense of aggravated criminal sexual assault and contains the same elements of the greater-included offense. See 720 ILCS 5/2-9; 720 ILCS 5/11-1.30. As such, Walters was on full notice of the elements of the charges he faced at trial.

¶ 45     Walters's reliance on *State v. Peterson*, 998 N.W.2d 876 (Iowa Ct. App. 2023), is misplaced, for the defendant in *Peterson* was never charged with the lesser-included offense of which he was eventually convicted. Furthermore, the record does not remotely support Walters's accusation that the State engaged in "gamesmanship" and "post-verdict vindictiveness" in electing which charges to proceed on and dismissing the rest before trial and then requesting a lesser-included offense after conceding that Walters was not proven guilty of aggravated criminal sexual assault. In sum, Walters is unable to show that the trial evidence was insufficient to support his convictions or that the trial proceedings violated his constitutional rights.

¶ 46                                III. CONCLUSION

¶ 47     For the reasons stated, we affirm the judgment of the circuit court of Cook County.

¶ 48     Affirmed.